JACKSON-RAYMOND COMPANY, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27298, 27374, 27375. Filed February 9, 1955.

---

[1] Proceedings of the following petitioners are consolidated herewith: Saul Loewenstein, Marjorie Loewenstein, Edward Prosen, Zelma Prosen, Fannie G. Kohn, as Directors and Trustees in Dissolution of Jackson-Raymond Company, Inc., Docket No. 27374; Saul Loewenstein, Marjorie Loewenstein, Zelma Prosen, Fannie G. Kohn, Docket No. 27375.

John Enrietto, Esq., Fuller Holloway, Esq., and James P. Jones, Esq., for the petitioners.

James P. Powers, Esq., for the respondent.

830

832

OPINION.

BRUCE, *Judge:* It is petitioner's contention that intangible assets which were not includible in invested capital made important contributions to its income; that its invested capital was abnormally low; and that its excess profits credits, based on invested capital, result in an excessive and discriminatory tax for each of the years involved.

We have found as a fact that the services of petitioner's three organizers and principal officers were important factors in the success of its business. We may assume that this fact qualifies the petitioner for relief under section 722 (c) (1) of the Internal Revenue Code of 1939.[3] See *Danco Co.*, 14 T. C. 276, 17 T. C. 1493. However, to be entitled to any of the relief sought, petitioner must establish a fair and just amount representing normal earnings to be used as a constructive average base period net income, which would result in excess profits credits, based on income, greater than those allowed by the respondent under the invested capital method. *Green Spring Dairy, Inc.*, 18 T. C. 217; *Sartor Jewelry Co.*, 22 T. C. 773.

Petitioner has submitted a proposed reconstruction which results in a constructive average base period net income of $199,001. The reconstruction is based upon the following premises:

1. Petitioner's business was the manufacture and sale of all types of uniform shirts and slacks.

2. Petitioner did not attain full development of this business until about the beginning of its fiscal year ended November 30, 1943.

3. Petitioner's method of operation during the base period, had it then been in existence, would have been about the same as in 1943, 1944, and 1945.

4. Petitioner would have occupied the same relative position in the shirt manufacturing industry in the base period, had it then been in existence, as in 1943, 1944, and 1945.

With these assumptions, and using data relating to selected segments of the shirt manufacturing industry, petitioner obtains a factor of $\frac{22.211}{19.688}$ representing the ratio of total shirt production in 1939 to the total shirt production in 1944, and a factor of $\frac{82}{107.1}$ representing the ratio of 1939 wholesale clothing prices to 1944 prices, and applies these factors to determine petitioner's 1939 constructive shirt production and constructive net sales as follows:

(c) Petitioner produced 40,547 dozen shirts in the calendar year 1944.

(d) The approximate wholesale price of petitioner's shirts during its fiscal period ended November 30, 1944, was $42.97 per dozen.

(e) When petitioner's shirt production in 1944 is multiplied by the ratio of total shirt production in 1939 to total shirt production in 1944 a constructive shirt production for petitioner for 1939 of 45,886 dozen results.

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

\* \* \* \* \* \* \*

(f) When the wholesale price of petitioner's shirts in 1944 is multiplied by the ratio of 1939 wholesale clothing prices to 1944 wholesale clothing prices, a constructive wholesale price for petitioner's shirts for 1939 of $32.90 per dozen results.

(g) When petitioner's constructive shirt production in 1939 is multiplied by petitioner's constructive wholesale price for shirts in 1939, constructive sales for petitioner for 1939 in the amount of $1,509,649 result. This amount is 57.35% of $2,632,209, the average of petitioner's 1943, 1944, and 1945 net sales.

Petitioner's net sales in 1939 would have been equal to approximately 60% of the average of its net sales in 1943, 1944, and 1945 if it had been in operation throughout 1939. 60% of the average of petitioner's net sales in 1943, 1944, and 1945 is $1,579,325.

Having thus determined 1939 constructive net sales, petitioner uses the general index of public activity in the United States, as compiled by the Bureau of Internal Revenue, for backcasting and arrives at constructive net sales for the other base period years of $1,572,218 in 1936, $1,687,351 in 1937, and $1,426,288 in 1938.

The expense deductions for the base period are computed, generally, on the percentages as established in 1943, 1944, and 1945, with certain minor adjustments.

The constructive net income, as thus computed, is $200,507 in 1936, $219,080 in 1937, $174,699 in 1938, and $201,716 in 1939, or an average for the base period of $199,001.

The keystone of petitioner's rather complicated structure of base period earnings is the assumption that had petitioner been in existence during the base period years, it would have occupied the same relative position in the shirtmaking industry that it occupied in 1943, 1944, and 1945.

The petitioner's business was not comparable to that of other manufacturers comprising the shirtmaking industry as a whole. It produced a highly specialized line of merchandise. While, as we have found, its organizers contemplated manufacturing various types of uniform shirts and slacks, its entire production for the first 3 years of operation consisted of military goods, particularly uniform shirts. The demand for these shirts increased rapidly with the expansion of the Armed Forces. The evidence shows that over the period 1939–1945 the number of officers in the United States Army increased from about 13,000 to approximately 772,500. There was a much more limited market for uniform shirts during the base period years. Whether without the military outlet petitioner would have been able to develop any substantial volume of business for nonmilitary uniform apparel, is highly problematical. There is no convincing evidence that it would have been able to do so. See *Harry Lang Manufacturing Go.*, 19 T. C. 567.

It was through the introduction to the trade of its line of superior quality, military type shirts that petitioner was able to establish its

position in the industry. Without this readymade market for its products it might or might not have been able to gain a sound foothold. While, according to the evidence, there was a growing demand for uniform shirts of various types during the base period years, there is no convincing evidence that the shirt manufacturers then supplying that trade were not able to hold it, or that on a competitive basis petitioner would have been able to gain any substantial portion of it. Neither is there any assurance that petitioner would have undertaken to present to the trade, during the base period, the superior quality, high-priced shirts which it later produced, or that under base period economic conditions they would have been acceptable to the buying public.

Notwithstanding the resourceful and diligent efforts of petitioner's counsel to combat it, we cannot escape the conviction that petitioner's business gained the success it did largely because of war conditions, and that no acceptable basis for reconstructing it as a normal, peacetime enterprise has been established. Compare *Crowncraft, Inc.*, 16 T. C. 690; *Fezandie & Sperrle, Inc.*, 5 T. C. 1185.

For the reasons stated, and without undertaking to resolve the numerous other differences between the parties, we hold that the respondent did not err in disallowing petitioner's claims for relief under section 722.

Reviewed by the Special Division.

*Decisions will be entered for the respondent.*