COLUMBIA TOOL STEEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29705. Filed October 22, 1956.

*Eugene Meacham, Esq.*, and *Fred R. Tansill, Esq.*, for the petitioner. *William D. Crampton, Esq.*, for the respondent.

---

## OPINION.

KERN, *Judge:* This is a so-called commitment case arising under section 722 (b) (4), Internal Revenue Code of 1939. The petitioner's contentions are that it increased its plant capacity after December 31, 1939, under a course of action to which it was committed prior to January 1, 1940, by approximately 71.5 per cent, and that with such increased capacity its base period production and sales would have increased in the same proportion. Thus, in its proposed reconstruction of base period income, base period capacity is increased from 2,535 tons of tool steel per annum to 4,350 tons. Constructive sales are determined by applying to constructive plant capacity the same percentage of plant capacity utilized by the petitioner in each of the base period years and constructive base period net income by applying

to constructive sales the ratio of net income to sales established by the petitioner in its actual base period experience.

The respondent does not dispute that petitioner was committed to an increase in plant capacity prior to January 1, 1940, as claimed, but he argues that the change was not substantial, measured in terms of potential base period output and net earnings, and in no event could the change have resulted in base period earnings sufficient to produce a constructive average base period net income which would yield excess profits credit equal to that allowed petitioner for the years 1942 to 1945, inclusive, under the so-called 75 per cent rule of section 713 (e), Internal Revenue Code of 1939. In the adjustment under section 713 (e), petitioner's average base period net income was increased from $194,449.69 to $221,861.73.

We do not understand respondent's contention to be that the addition of the new 6-ton furnace of nearly twice the melting capacity of the electric furnace then in use, with a stepped-up capacity of 3½ tons, was not a "substantial" increase in melting capacity. His argument is that petitioner suffered no loss of sales in the base period by reason of inadequate melting capacity; that occasional losses of sales in the base period were normal for the petitioner, and the industry; and that in petitioner's case, especially, any appreciable loss of base period sales resulted from incomplete and unbalanced inventories of finished stock from which immediate deliveries could be made, a condition which would not have been helped by an increase in melting capacity.[2]

Respondent contends further that the petitioner decided to add the increased capacity, about the close of 1939, not because of any long overdue need, as petitioner contends, but in anticipation of a war-inflated demand for tool steel.

Petitioner's basic theory in this case is that in the tool steel industry, capacity for production predetermined the sales of the individual manufacturers, or, in other words, that an increase in petitioner's capacity for production would necessarily result in a corresponding increase in petitioner's production, sales, and profits.

We are unable to accept this theory in spite of the testimony of petitioner's expert witness and the conclusions expressed in the testimony of certain other witnesses, particularly the testimony of petitioner's president. To the contrary, we agree with respondent's expert witness that an increase of capacity in the tool steel industry would result from an actual or anticipated increase in the demand for, i. e., sales of, tool steel, rather than that an increase in the sales of tool

---

[2] While the petitioner argues that the depleted state of its base period inventories was due in large part to its limited melting capacity, it is noted that petitioner's furnace lay idle for 8 months in 1938, and that only 180 heats were run in that year, compared with 808 heats in 1937. Petitioner's president testified that the inventories were limited by the management to a definite ceiling in dollar value, and that additional melting capacity in the base period would not have helped the inventory situation appreciably.

steel would be caused by an increase in the capacity of production. See *National Grinding Wheel Co.*, 8 T. C. 1278; *Green Spring Dairy, Inc.*, 18 T. C. 217. The record indicates that this was also the opinion of petitioner's management and management in the entire tool steel industry during the base period. Petitioner's president testified that while petitioner considered increasing its capacity in the base period, it did not do so because of business conditions, and that as those conditions were in 1938, the new capacity, in his opinion, would not have "capitalized"—that is, brought in enough new business to pay for the investment within a period of 10 years. The evidence contains no account of any tool steel manufacturer increasing its capacity during the base period and realizing a proportionate increase in business. The evidence is, on the other hand, that during the base period the industry as a whole actually reduced its capacity for production.

It may well be that, with the increased capacity in the base period which would have resulted from the additional furnace and other improvements, the petitioner might have obtained more orders, produced more tool steel, made more sales, and realized larger net profits. The additional facilities gave petitioner other advantages than the actual percentage increase in melting capacity. The new 6-ton furnace used interchangeably with the smaller furnace permitted flexibility in the melting sequence, thereby reducing the contamination danger as well as the delivery time on special orders, reduced the melting time on certain types of products, and enabled petitioner to produce larger sized ingots than it could produce with the 3½-ton furnace. The mechanical improvements in the new furnace and the other plant improvements which petitioner made under the commitment increased the efficiency of the entire plant and tended to reduce operating costs.

But it seems obvious to us that the effect of any or all of these betterments on sales and net profits would not have been in direct proportion to the increase in capacity. Since the tool steel market was limited, no amount of increased capacity would have increased the allover industry sales. Less than half of the industry capacity was utilized in the base period. The petitioner utilized, on an average, about 53 per cent of its base period capacity, and the industry as a whole only about 35 per cent of its capacity. As found above, tool steel purchasers usually placed their orders where they could get the earliest deliveries. This tended to have a leveling effect on the sales of the different tool steel manufacturers and to keep an even distribution of business over the entire industry. Slack orders for a manufacturer resulted in increased unused capacity, which permitted quicker deliveries which, in turn, brought in more orders. A gain in sales by one manufacturer meant a loss in sales to the others. Even with an increased capacity and greater flexibility of operation in the base period there would still

have been a time limitation on the filling of petitioner's orders which would have become progressively greater as orders increased, until the "leveling off" process asserted itself to divert orders to other manufacturers. Just when that point might have been reached and what would have been the limit on petitioner's ability to divert orders from the other manufacturers, we have no way of knowing. Therefore, while we are of the opinion that an increased melting capacity during the base period might have resulted in petitioner obtaining more orders, making more sales, and realizing larger net profits, the amount of the additional orders, sales, and profits is not ascertainable on the record. Neither does the record justify us in making a guess or approximation of the probable amount of such additional orders, sales, and profits.

From our study of the entire record, including not only the carefully prepared opinion testimony offered by petitioner's expert witness but also that of the other witnesses, and especially the straightforward, informative testimony of petitioner's president, Arthur T. Claridge, and the mass of statistical data which the parties have submitted, by stipulation or otherwise, we have concluded that had the petitioner made the committed changes in capacity at the beginning of 1938 its constructive average base period net income would not have been greater than its average base period net income determined under section 713 (e).

Therefore, we conclude that the petitioner has not established that the tax computed without the benefit of section 722 resulted in an excessive and discriminatory tax and has not established what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. See *Danco Co.*, 14 T. C. 276, 290.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*