## The Danco Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 19519. Promulgated February 28, 1950.

*William C. Bracken, Esq.*, for the petitioner.

*Lawrence R. Bloomenthal, Esq.*, and *Edwin L. Kahn, Esq.*, for the respondent.

278

OPINION.

ARUNDELL, *Judge*: In this proceeding, the petitioner challenges the deficiencies in excess profits tax determined by the respondent for the taxable years 1942 and 1943 on the ground that under the provisions of section 722 (c) of the Internal Revenue Code it is entitled to refunds in the amounts of $7,026.32, with interest, and $26,765.10, with interest, representing excess profits taxes paid in the years 1942 and 1943, respectively.

Generally speaking, section 722 (c)[1] provides that the tax shall be considered excessive and discriminatory where a taxpayer is not entitled to use the excess profits credit based on income under section 713 if it can be shown that the excess profits credit based on invested capital is an inadequate standard because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

(2) the business of the taxpayer is of a class in which capital is not an important income-producing factor, or

(3) the invested capital of the taxpayer is abnormally low.

The existence of one of the qualifying conditions specified in the statute is not sufficient to establish a taxpayer's right to relief under section 722 (c), for the reason that the condition may not result in the invested capital method being an inadequate standard for the determination of the excess profits credit or because it may be more than outweighed by other unusual war conditions operating to the taxpayer's advantage during the taxable years. Therefore, the taxpayer must demonstrate the inadequacy of its excess profits credit based on invested capital by showing that the inadequacy results from one of the above factors and by establishing within the framework of section 722 (a)[2] a fair and just amount representing normal earnings to be used as a constructive average base period net income.[3]

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

(2) the business of the taxpayer is of a class in which capital is not an important income-producing factor, or

(3) the invested capital of the taxpayer is abnormally low.

In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a). \* \* \*

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722

Petitioner contends that its excess profits credit based upon invested capital for each of the years 1942 and 1943 was an inadequate standard, due to the existence of the conditions or factors described in subsections (1) and (2) of section 722 (c). Specifically, petitioner submits that its business was of a class in which intangible assets not includible in equity invested capital under section 718 made important contributions to income, and that its business was of a class in which capital was not an important income-producing factor.

The petitioner argues that C. George Danielson had valuable contacts with the trade prior to its organization; that he had special technical skill and ability and a comprehensive knowledge of the problems of production; and that he had an established reputation for ability and performance in connection with work under his supervision. Petitioner's view that these characteristics of Danielson constituted intangible assets contributing to its income is based upon the conclusion that Danielson's contacts and reputation in the trade were material factors in the customers' decisions to place orders with the petitioner. Petitioner further contends that, since Danielson was its organizer, principal stockholder, president, and manager in full charge of its production and policies, the petitioner started business in 1940 with an established good will.

Respondent, on the contrary, argues that the only intangible assets that the statute contemplates are such assets as are owned by the petitioner, and that Danielson's contacts were purely personal to him and could never become petitioner's property, and that for the use of his contacts and experience Danielson was fully compensated by the petitioner.

It is true that Danielson's contacts, reputation, skill, and personal characteristics did not become the property of petitioner and that,

(b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

[3] The bulletin on section 722, part I (D) states:

"The mere presence of a factor under section 722 (b), or the existence of the situation under section 722 (c), is not a sufficient qualification for relief. Relief is based upon an inadequacy of the actual average base period net income or the excess profits credit based on invested capital shown to exist as a result of such factor or situation. This inadequacy will obtain if the actual average base period net income is less than the constructive average base period net income determined under section 722, or if (in the section 722 (c) cases) the excess profits credit based on invested capital is less than the excess profits credit based upon the constructive average base period net income. Section 722 is an integrated and unified provision which cannot be broken up into two parts, one of which makes a taxpayer eligible for relief (sections 722 (b) and 722 (c)), and another of which provides for the determination of the amount of relief (section 722 (a)). There can be no valid contention that a taxpayer is eligible for relief under one portion of section 722 but is denied a constructive average base period net income under another portion of the section."

within the meaning of section 718,[4] their value, whatever it might be, was not includible in the petitioner's equity invested capital. Indeed, it has long been held that "Ability, skill, experience, acquaintanceship, or other personal characteristics or qualifications [of an officer or employee] do not constitute good will as an item of property; nor do they exist in such form that they could be the subject of transfer." See *Providence Mill Supply Co.*, 2 B. T. A. 791; *Northwestern Steel & Iron Corporation*, 6 B. T. A. 119; *Amalgamated Products Co.*, 12 B. T. A. 659; *Wickes Boiler Co.*, 15 B. T. A. 1118; *D. K. MacDonald*, 3 T. C. 720, 727; *John Q. Shunk*, 10 T. C. 293, 303.

However, section 722 (c) (1) is concerned with intangible assets that are *not includible* in invested capital under section 718 which nevertheless make important contributions to income, and the immediate question is whether the attributes and qualifications of Danielson as found to exist do in fact constitute such intangible assets within the meaning of this subsection. There is no requirement in section 722 (c) (1) that the intangible assets must be owned by the corporation.[5] The statute merely requires that the intangible assets must make important contributions to the corporation's income.

A recent pronouncement of the Excess Profits Tax Council fully supports this view. E. P. C. 36, 1949–1 C. B. 137. In that case a partnership consisting of two individuals opened a restaurant in New England in 1928 and another restaurant on the Gulf Coast in 1936, both of which enjoyed a national reputation. In 1941 the two partners and another individual organized a corporation to operate a restaurant in a South Atlantic resort city. The new restaurant was designed and operated on the same plan and with the same name, decorations, menus, and recipes as the restaurants of the partnership. The corporation paid nothing to the partnership for the use of the name, recipes, and menus. The determination of the Excess Profits Tax Council was as follows:

---

[4] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

(1) Money Paid In.—Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

(2) Property Paid In.—Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange.

\*          \*          \*          \*          \*          \*          \*

[5] E. P. C. 35, 1949–1 C. B. 134, 135, states:

"The taxpayer's rights in the intangible asset, whether legal title, equitable title, license or privilege of use, or any other, must be such that the income contributed by the intangible is properly includible in the taxpayer's income. It is not sufficient if taxpayer is merely the assignee of the income of the intangible. The contribution of the intangible asset to income, while it may be direct or indirect, must be important in the sense that it is significant in relation to the taxpayer's total income."

In E. P. C. 35 (1949–1 C. B. 134), the Council held that ownership of the intangible asset, in a strict legal sense is not required by section 722 (c) (1). The asset here involved is, in fact, the reputation, or good will, of the partnership which the taxpayer is using by permission of the partnership. Also involved are the recipes of the partnership, which might be compared with secret formulas of a manufacturer. It is therefore held that the K Corporation's business is of a class in which intangible assets not includible in invested capital make important contributions to income.

The entire testimony in the instant case compels the conclusion that Danielson's contacts in the trade were responsible for the immediate flow of business to petitioner. A number of witnesses testified that it was his association with the enterprise and his ability and cooperativeness that caused them to place their orders with this new company. The petitioner was not simply manufacturing and selling an article. In conducting a customs business, it was performing a service in accordance with the specifications outlined by its customers. Danielson's contacts and reputation in this type of business immediately provided the petitioner with the benefit of good will of considerable value, albeit, as we have said, such good will did not constitute an intangible asset includible in its equity invested capital under section 718. That section 35.722–4 (a) of Regulations 112 also recognizes this situation as a qualifying factor under section 722 (c) (1) will appear from the following statement:

*  *  *  Corporation M commenced business in 1940. Its business was of a class which required little invested capital but necessitated the establishment of contacts with the trade in which it would obtain its customers. It lost money during its first two years of operation, but by 1942 had built up patronage and showed a considerable profit. If its invested capital was very small, its excess profits credit based on invested capital would be an inadequate standard for determining excess profits, and the corporation would be entitled to file a claim for relief under section 722 for the year 1942 and subsequent years.

In our opinion, the personal contacts and attributes of Danielson resulted in petitioner having the benefit of an established good will that made important contributions to its income during the taxable years in question within the meaning of section 722 (c) (1), although such good will was not includible in its equity invested capital within the meaning of section 718.

Petitioner's second contention, based upon section 722 (c) (2), is that its business was "of a class in which capital is not an important income-producing factor." The parties have not cited nor have we been able to discover any prior decision involving the interpretation of section 722 (c) (2).

Petitioner argues that "Capital is not an important income producing factor" if "the business is of a type showing a high return on invested capital." In support of this position, petitioner points to

the following language of the Report of the Senate Committee on Finance (S. Rept. No. 1631, 77th Cong., 2d sess., p. 203) :

Under existing law, a taxpayer not entitled to use the excess profits credit based on income is not entitled to relief. This places in a disadvantageous competitive position corporations commencing business after January 1, 1940, as well as other corporations deprived of such credit *if the business is of a type showing a high return on invested capital,* or if for some reason peculiar to the corporation, the invested capital is unusually low. [Italics supplied.]

In further support of its position, petitioner points to the very low excess profits credit allowed to it based on the invested capital formula and the very high percentage of its profits and net income to its invested capital.

Respondent, on the contrary, takes the position that the word "important" as used in section 722 (c) (2) is to be interpreted in the same manner as "material" in section 725, having to do with personal service corporations. See E. P. C. 35, 1949–1 C. B. 134; *Gus Grissmann Co.*, 10 T. C. 499; *Graham Flying Service*, 8 T. C. 557; affd., 167 Fed. (2d) 91; certiorari denied, 335 U. S. 817; *Fairfax Mutual Wood Products Co.*, 5 T. C. 1279; *Atlanta-Southern Dental College* v. *Commissioner*, 50 Fed. (2d) 34.

We are of the opinion that capital should be regarded as "not important" within the meaning of section 722 (c) (2), where the taxpayer's business is of a class in which the normal profit is so greatly in excess of the normal return on invested capital of 8 per cent recognized by the statute that the large discrepancy between such profit and such normal return clearly indicates that the invested capital method is inadequate as a basis for determining its excess profits credit.

In determining whether a taxpayer's business is of a class in which capital is not an important income-producing factor, all material facts bearing upon the petitioner's business operations must be considered and substantiation may be sought in the form of evidence of the experiences of other firms engaged in the same type of business in the same locality. Our views in this respect are in accordance with those expressed by the Excess Profits Tax Council in its definition of "class" as set out in E. P. C. 35, *supra:*

The provision that taxpayer's business must be "of a class" does not imply that there be a division of businesses into trades or industries, or that any other separation into specified groups is required. Here, the word "class" is used in the sense of type, character, or nature, rather than with any requirement that businesses must be segregated into classes. If the nature of the taxpayer's business function, the character of its organization, or the methods it employs in operation are such that intangible assets of the character in question make important contributions to income, it is considered that it falls within the purview of the statute.[6]

---

[6] E. P. C. 35 also states:
"The words 'class' and 'important,' as used in section 722 (c) (2), have the same general meaning as in section 722 (c) (1)."

The record shows that the petitioner's net income for 1941 was over 100 per cent of its combined capital and surplus at the beginning of 1941; that its net income for 1942 was approximately 240 per cent of its total capital and surplus at the beginning of 1942; and that its net income for 1943 was approximately 425 per cent of its total capital and surplus at the beginning of 1943. Although we have no evidence of the net income of comparable firms during the excess profits tax years, the record shows that, during the years 1936, 1937, and 1939, Artisan realized gross profits considerably in excess of its total capital and surplus. (Cf. E. P. C. 37, 1949–1 C. B. 138.)

It is also undisputed that the formula used generally in the trade during the base period years was designed to yield net earnings equal to 20 per cent of sales. Under this formula, the cost of direct labor and material to be used in the product was estimated, to which was added overhead fixed at 100 per cent of the estimated cost of direct labor, the total of which items constituted 80 per cent of the selling price, the remaining 20 per cent being the company's net profit.

It is clear that the petitioner's business was of a class in which capital was not such an "important income-producing factor" as to warrant limiting its normal profits to 8 per cent on its invested capital as contemplated by the statute as a normal return for corporations whose excess profits credit would be determined on the basis of invested capital. Moreover, petitioner's competitors who were in existence during the base period years possessed, at the time of the imposition of the excess profits tax, an election to compute their excess profits credit on the basis of invested capital or on the basis of average income, and, being members of an industry in which a high return on invested capital was characteristic, they were able to obtain a larger excess profits credit by the use of the average income method. Our conclusion that the petitioner has met the requirements of qualification under section 722 (c) (2) alleviates this inequity and permits the petitioner to obtain the relief to which it can show itself to be entitled.

As we have previously pointed out, the mere existence of the qualifying features of section 722 (c) does not establish a taxpayer's right to relief. The petitioner must further demonstrate the inadequacy of its excess profits credit based upon invested capital by establishing under section 722 (a) a fair and just amount representing normal earnings to be used as a constructive average base period net income. Cf. *Lamar Creamery Co.*, 8 T. C. 928; *Irwin B. Schwabe Co.*, 12 T. C. 606.

The petitioner states that its constructive average base period net income should be computed on the basis of the general formula which was commonly used by Artisan and other companies from 1936 to 1939 to fix the sales price of custom work. Thus, the petitioner contends that 20 per cent of its net sales in 1942 and 1943 fairly represents a constructive average base period net income to be used in

computing its excess profits credit for each year. It makes no effort to establish what its own sales, gross profits, administrative costs, or net income could reasonably have been expected to be during the base period years. In our opinion, a fair and just amount representing petitioner's normal earnings can not be established under the method proposed.

The inherent fallacies in the petitioner's contentions are obvious. It is abundantly clear that by "constructive average base period net income" section 722 (a) contemplates that a taxpayer's normal earnings over the base period years will be expressed as a fixed amount and not as a percentage to be applied to sales from year to year as proposed by the petitioner. See secs. 713 and 722 (d), I. R. C. Under the system the petitioner suggests, it is inevitable that a different constructive "average" base period net income must be determined for each taxable year, a result clearly not contemplated by the statute. Moreover, such a system would bring about inequities between taxpayers as great as those sought to be corrected by section 722 (c). An unfair tax advantage would be gained by the petitioner if it were allowed, in computing its excess profits credit, to use as its normal earnings 20 per cent of its 1942 and 1943 sales, whereas those of its competitors who were in existence during the base period years would be limited to the same percentage of their sales as for prewar years.

The petitioner's proposed computations are also in conflict with section 722 (a), which provides that in determining the constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or the taxpayer generally occurring or existing after December 31, 1939, except that under section 722 (c) the nature of the taxpayer and the character of its business may be considered to the extent necessary to establish its normal earnings. In our opinion, the exception as to evidence of the nature and character of the taxpayer's business does not sanction the petitioner's use of its actual sales after December 31, 1939, in the manner proposed by the petitioner for the computation of a constructive average base period net income.[7]

Although section 35.722–4 (c) of Regulations 112 recognizes the fact that no exact criteria can be prescribed for the computation of the constructive average base period net income of a taxpayer under section 722 (c), we feel that the taxpayer seeking relief must be prepared to submit the facts from which this Court may reasonably determine

---

[7] The bulletin on section 722 (part VII, par. E, pp. 136–137) states:

"* * * no significance can be attached to the actual rate of development or earnings of a taxpayer that began business subsequent to the end of the base period. Constructive normal earnings can never be based on post-1939 circumstances. The constructive normal earnings of a taxpayer under section 722 (c) are the earnings it would have obtained from normal operations during a period of normal conditions for general business."

with some degree of accuracy the probable amount of its normal earnings for use as a constructive average base period net income.

In the instant case we find it impossible to fix the relative position of the petitioner in its industry for the reason that there is no evidence of the experiences of comparable firms during the taxable years from which we might make an analysis such as suggested in the regulations.[8] There is no satisfactory evidence of competitive conditions as they existed in the industry during the base period years, the demand for custom work during the base period years, or the extent to which business in the industry increased during the excess profits years due to war conditions. No testimony was offered in respect to what share of the total available business existing during the base period years petitioner could reasonably have been expected to capture, or the volume of business it could have attained by the close of the base period had it commenced business during the base period.

The record contains figures representing the total capital and surplus, sales, and gross profits of Artisan and the sales and gross profits of another unidentified company during the base period years. However, there is no evidence relative to the standing of these firms in the industry, the detail of their operating techniques, the *net income* realized, or any factual basis upon which a valid comparison of the petitioner may be made.

At the hearing of the instant case, an accountant for the petitioner and an economist for the respondent apparently reached a tentative agreement in respect to some of the needed facts. Petitioner's counsel, however, objected to the proposed stipulation and the information contained therein never became a part of the record in this case. Petitioner's objection was based on his contention that the data as to one of the comparables was inaccurate and that the net income of the comparable concerns considered in the stipulation was not a fair measure of their earnings due to the large salaries paid to officer-stockholders during the base period years.

---

[8] Regulations 112, section 35.722–4 (c), reads in part as follows:

"* * * In the case of a taxpayer commencing business after December 31, 1939, *it is necessary to examine the type of business engaged in, the relationship between its profits and invested capital, its profits and sales, and the profits and invested capital and profits and sales of comparable concerns, the earning capacity of the taxpayer, the character and experience of the management, the nature of the competition encountered, and all other factors pertinent in constructing normal earnings.* The mere fact that earnings after December 31, 1939, exceed the amount of the excess profits credit based on invested capital is not of itself an indication that the taxpayer is of a class which shows a higher than average return upon capital or that its invested capital is abnormally low. *Therefore any facts or conclusions derived with respect to the period after December 31, 1939, shall be related to the base period;* or, if the base period does not represent a period of normal earnings for the type of business exemplified by the taxpayer, to another period of average normal earnings; and in either case the taxpayer must establish that it would satisfy the provisions and conditions of section 722 (c) and of this section for such period." (Italics supplied.)

As we have previously stated, it is the design of the statute that a taxpayer must demonstrate the inadequacy of its excess profits credit by establishing a fair and just amount representing normal earnings for use as a constructive average base period net income in addition to showing the existence of the qualifying factors listed in subsections (1), (2), and (3) of section 722 (c). Although the record as a whole convinces us that petitioner could have successfully entered the industry during the base period years and realized some earnings, it is our opinion that the petitioner's failure to provide sufficient evidence from which its normal earnings could be reasonably determined defeats its contention that its excess profits credit based upon invested capital constitutes an "inadequate standard for determining excess profits" within the meaning of section 722 (c).

The petitioner has not contested various adjustments made by the respondent in his determination of deficiencies for both years, but bases its appeal herein solely upon the respondent's rejection of its application for refunds under section 722 (c). As the petitioner has failed to establish its right to such refunds, the respondent's determination as set out in the notice of deficiency is sustained.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*