NORTH FORT WORTH STATE BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29569.   Filed June 11, 1954.

*R. B. Cannon, Esq.,* for the petitioner.
*Allen T. Akin, Esq.,* for the respondent.

542

OPINION.

TURNER, *Judge:* The petitioner, being a corporation which was not entitled to use an excess profits credit based on income, pursuant to section 713 of the Internal Revenue Code, because it came into existence after December 31, 1939, claims that it qualifies for relief under section 722 (c) (1),[1] on the ground that its excess profits credit, based on invested capital, was an inadequate standard for determining its excess profits, because its business was of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income. At the hearing, petitioner waived its claim that its invested capital was abnormally low and by reason thereof it was qualified for relief under section 722 (c) (3).

If petitioner is to prevail, two conditions must be met. It must appear that its business was of a class in which intangible assets not includible under section 718 of the Code make important contributions to income, and, if such is the case, it must also appear that the excess profits credit allowable to petitioner on the basis of its invested capital was an inadequate standard for determining its excess profits, because it was less than the excess profits credit based upon what would be the fair and just amount "to be used as a constructive average base period net income" for petitioner. *Danco Co.*, 14 T. C. 276.

Aside from any question as to the class[2] in which the business of petitioner falls, for the purposes of section 722 (c) (1), the identity of the intangible asset or assets claimed as making important contributions to income is not as clear and definite as it should be. After some reference in its opening brief to deposits as the good will of a bank's customers, it was stated that petitioner started business with that "indispensable asset, viz., competent management of unquestioned integrity." In its reply brief, the intangible asset which, it was claimed, petitioner enjoyed was described as "the contacts that peti-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income.

[2] E. P. C. 35, 1949–1 C. B. 134, 135, provides in part as follows :

The provision that taxpayer's business must be "of a class" does not imply that there be a division of businesses into trades or industries, or that any other separation into specified groups is required. Here, the word "class" is used in the sense of type, character, or nature, rather than with any requirement that businesses must be segregated into classes. If the nature of the taxpayer's business function, the character of its organization, or the methods it employs in operation are such that intangible assets of the character in question make important contributions to income, it is considered that it falls within the purview of the statute.

tioner's management had made with depositors and potential depositors, and the willingness on the part of such depositors to place their funds in petitioner's custody and to permit it to use such funds in its business and to realize for itself a return thereon, without demanding any compensation from petitioner for the use of such funds, other than the willingness and ability of petitioner to have available at all times adequate funds with which to pay checks drawn by its depositors on their respective accounts."

If we follow the petitioner's argument to its ultimate conclusion, it is that the ability, integrity, and standing of its officers were of such superior quality as to put it in a class apart from banks generally and to instill such confidence in depositors and potential depositors that it was able thereby to procure deposits in such amounts as to provide it with funds for the making of loans and earning of interest over and above that which might otherwise have reasonably been expected in a banking business. The evidence does indicate, and we have found as a fact, that the Wilemon brothers and Rhea were generally regarded as experienced and capable bankers and successful businessmen. There is no evidence, however, as to the extent of the deposits, if any there were, which were attracted to petitioner by reason of these things. Beyond the fact that Armour & Company did open and maintain a checking account so that its employees might cash their salary checks without charge and that the balance in the account was usually equal to the amount of employees' checks which petitioner might be called on to cash at any one time, and the further fact that petitioner, regardless of the capabilities and standing of its management, was unable to procure an account from Swift & Company at all, we know nothing about petitioner's depositors or deposits, other than the aggregate amount of the deposits at certain dates. Insofar as the record shows, the petitioner at no time procured deposits in any greater amount than would have been possible or likely for a bank located in a similar or comparable area under any other management. Such a bank as petitioner was would have been required to meet the same requirements of the State banking laws and to operate under the regulation and supervision of the State Banking Department, to maintain the necessary reserves, and to preserve its capital, as was petitioner. In short, there is no evidence which would indicate that petitioner through assets, whether tangible or intangible, and whether includible or excludible from invested capital, succeeded in attracting deposits to any greater extent than would have been the case had a bank meeting the requirements of the banking laws, but other than petitioner, been established in North Fort Worth.

Assuming, therefore, but not deciding, that the power, ability, or whatever it may be termed of the petitioner to draw and attract

deposits is, for the purposes here, an intangible asset which makes an important contribution to petitioner's income, but is not includible in its invested capital, we would be no more than saying that petitioner is, in that respect, comparable or similar to banks generally.[3] And yet, petitioner strenuously resists the respondent's comparison of its operations and the result thereof with either the corporate banks and trust companies of the United States or the banks of the Eleventh Federal Reserve District, the district in which the petitioner is located, for the purpose of testing petitioner's claim as to a proper constructive base period net income and that its excess profits credit, based on invested capital, was an inadequate standard for determining the extent to which its profits for the years herein were excess profits, if any, under the provisions of the Internal Revenue Code. The reason for such resistance is apparent, and it is that a constructive average base period net income which would be derived by such comparison would not result in an excess profits credit greater than that which has been determined and allowed to petitioner on the basis of its invested capital.

At this point, it may be noted that at January 14, 1942, total deposits of the banks of the Eleventh Federal Reserve District had increased greatly over what they had been during the base period, and were more than 50 per cent greater than they had been at January 12, 1938. It may also be noted that during the interval from 1934 to 1941, the promotion of a bank for North Fort Worth had been considered and attempted, but no bank had materialized.

There is, if we understand the facts aright, one noticeable difference or distinction between petitioner and banks generally as we know them. That difference, however, is not in the method or pattern for attracting deposits, but in the use of the money received on deposit which, in turn, is utilized in the earning of the bank's income. The evidence shows that petitioner in making its loans did not follow the pattern of banks generally, but carried on a loan business closely resembling that of the so-called "small loan" operators. On such loans the rate of return is very much greater than that on more conservative loans made by banks generally. The money so loaned, however, was definitely tangible, and the parties so agree. It did not, therefore, constitute intangible assets, for the purposes of section 722 (c). By reason, however, of the fact that the petitioner did

---

[3] A requisite for a bank charter under Texas law is that "the proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable." See Vernon's Ann. Civ. St., arts. 342, 305. And in E. P. C. 35, supra, footnote 2, it is said: "The personal characteristics of individuals * * * generally do not constitute intangible assets. So-called 'know how,' specialized knowledge, skill, experience, reputation, credit standing, and the like are ordinary and expected characteristics of persons undertaking the conduct of a business." In contrast, is Danco Co., 14 T. C. 276, where it was shown that the contacts and reputation of one of the taxpayer's officers in the trade were responsible for the flow of business.

specialize in industrial or small loans, the petitioner offers that fact as a basis for using, for the purposes of arriving at a proper constructive average base period net income for petitioner, a comparison other than banks generally. It does not, however, offer a group or multiple number of comparisons, but limits itself to the Arlington State Bank. The facts as found show that the Arlington State Bank was organized and operated under its own particular circumstances and its own individual surroundings. Those surroundings were wholly unlike those in which petitioner was organized and set up. It was not located in an industrial area. It is not shown or claimed that it earned its income by the making of industrial or small loans, even though there was some testimony that most of its loans were installment loans. We have undertaken in our Findings of Fact to set out such information as is of record with respect to the loans of that bank. There is, in our opinion, very little, if any more, basis for limiting the comparison here sought to the Arlington State Bank and its base period experience than the mere assertion of the petitioner in making its argument. We accordingly conclude that the petitioner has not shown that on the basis of the contribution of the assumed intangible asset to petitioner's income, a proper constructive base period net income would produce an excess profits credit greater or equal to the excess profits credit already determined and allowed by the respondent on the basis of its invested capital.

The petitioner has made the further claim that the use and occupancy of the building and equipment of the Stockyards Bank at the favorable rental at which the building and facilities were obtained was an additional intangible asset, for the purposes of section 722 (c) (1). Regardless of the merits of the claim as to the nature of the advantageous rental as an intangible asset, for the purposes herein, the proof with respect thereto, as in the case above, fails to establish any factual basis for the relief sought. Aside from the testimony that the rental payments required were very favorable to petitioner, the only other evidence was that in the opinion of Lawrence Wilemon it would have cost petitioner approximately $25,000 to have acquired the fixtures and equipment which were obtained at the favorable rental. There was no evidence, however, as to the margin by which the rent required of petitioner would have been increased if it had paid a full rental for the facilities used. We are accordingly unable to find or conclude that even if allowance should be made for some amount of rental saved by reason of the favorable lease, the amount thereof would have indicated any relief, and petitioner has not undertaken to show wherein it would.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*