CRESTWOOD PUBLISHING CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31531. Filed January 31, 1958.

*Sidney Gelfand*, for the petitioner.
*Martin D. Cohen, Esq.*, for the respondent.

#### OPINION.

MULRONEY, *Judge:* The petitioner claimed refunds of excess profits taxes under section 722 (c)[1] as follows:

| Taxable year ended April 30 | Amount |
|---|---|
| 1943 | $12, 158. 41 |
| 1944 | 61, 691. 87 |
| 1945 | 5, 605. 98 |

The respondent denied the section 722 (c) relief claimed in full and determined a deficiency in excess profits tax of $5,977.06 for the year ended April 30, 1943, payment of which was deferred pursuant to section 710 (a) (5).

The petitioner made additional claims by amended petition concerning its right to carry back certain net operating losses and certain alleged unused excess profits tax credits. The respondent states on brief that he is orally advised by petitioner's counsel that such additional claims have been abandoned. This is apparently the case as the record and briefs are devoid of evidence or argument concerning the

---

[1] All references hereinafter to Code section numbers refer to the Internal Revenue Code of 1939, unless otherwise specified.

claims. Petitioner apparently agrees that if we find that it does not qualify under section 722 (c), the asserted deficiency in excess profits tax is correct. Therefore, the only issue remaining is whether the petitioner qualifies for relief under section 722 (c).

The evidence in this case was presented before a commissioner of this Court and he made findings of fact based upon a stipulation and the record made. These findings were served upon the parties and both parties requested that we adopt such findings with certain proposed additions thereto. We feel that further findings are unnecessary; therefore, we adopt, for the purpose of this Opinion, the findings of fact of the commissioner.

The petitioner was organized on May 27, 1940, by Michael M. Bleier and Theodore Epstein for the purpose of publishing "pulp" magazines of the type sometimes referred to as "girlie" and "gag and cartoon" magazines. Two magazines were published the first year of operation and two others were added the second year. During the third year of operation, two publications of a different nature were substituted for two of the magazines published theretofore.

Petitioner began business with no paid-in capital. Its method of operations was to obtain paper, printing, and editorial matter on credit to publish the magazine. The publications were distributed by national distributors who perform the function of a circulation department and collection agency for publishers of pulp magazines. The petitioner used five of these national distributors at various times during the years 1940 to 1945.

The services of a distributor are obtained through negotiated contracts. The publisher presents the idea for a new publication to a distributor and if the publisher can convince the distributor that the publication will be successful, a contract is entered into. Pulp magazines, which have no subscription circulation to speak of, must of necessity be distributed by a national distributor to be successful. Once the salability of a magazine is determined, usually after two or three issues, any of the distributing companies would distribute the publication. The distribution contracts customarily have a provision allowing either party to terminate the contract after 60 days' notice.

As was customary in the trade at the time the printed copies of an issue of petitioner's magazines were delivered for distribution, the distributor advanced to petitioner a small percentage of the anticipated proceeds from sales. A publisher such as petitioner could use such advances to make payments on its accounts for paper, printing, and other services.

The petitioner, being a corporation which came into existence after December 31, 1939, was required under sections 712 and 714 to base its computation of excess profits tax credits on invested capital. It is now seeking a higher excess profits credit, based on a constructive

average base period net income under the provisions of section 722 (c) (1), (2), and (3), contending that its excess profits taxes for the years in issue are excessive and discriminatory within the meaning of section 722 (a).[2]

Section 722 (c),[3] generally speaking, provides that the tax shall be considered excessive and discriminatory if the taxpayer can show that the excess profits credit based on invested capital is an inadequate standard because:

(1) The business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

(2) The business of the taxpayer is of a class in which capital is not an important income-producing factor, or

(3) The invested capital of the taxpayer is abnormally low.

The petitioner contends that it qualifies for relief on each of the three grounds, or that each of the enumerated qualifying conditions existed in its case. The existence of one or all of the qualifying conditions specified in the statute is not sufficient however to establish a taxpayer's right to relief under section 722 (c). These qualifying conditions may not result in the invested capital method being an inadequate standard for the determination of the excess profits credit. The petitioner must, therefore, demonstrate the inadequacy of its

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

(2) the business of the taxpayer is of a class in which capital is not an important income-producing factor, or

(3) the invested capital of the taxpayer is abnormally low.

In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a). * * *

excess profits credit based on invested capital by showing that the inadequacy results from one of the above factors and by establishing within the framework of section 722 (a) a fair and just amount representing normal earnings to be used as a constructive average base period net income. *Danco Co.*, 14 T. C. 276. See also the Bulletin on Section 722, part I (D). In short, to qualify for the refund claimed, petitioner must show (1) the existence of one of the qualifying factors enumerated, (2) which results in an inadequate excess profits credit, and (3) a fair and just amount representing normal earnings to be used as a constructive average base period net income.

We will first determine whether petitioner has shown that it meets any of the qualifying conditions set out in section 722 (c). First of all, petitioner contends that its business is of a class in which intangible assets not included in invested capital make important contributions to income. According to the Bulletin on Section 722, as amended by E. P. C. 35, 1949–1 C. B. 134, 135, a corporation comes within the "class" referred to in section 722 (c) (1), "[i]f the nature of the taxpayer's business function, the character of its organization, or the methods it employs in operation are such that intangible assets of the character in question make important contributions to income * * *."

Petitioner lists two assets which, according to petitioner, come within the meaning of the statute. They are (1) the special standing, ability, and reputation of petitioner's owners and management in the operation of the business; and (2) the distribution contracts which petitioner negotiated with national distribution companies.

As to the first contention, we have held that the mere successful operation of a business through efficient management and competent personnel does not establish the existence of a qualifying factor under section 722 (c) (1). *North Fort Worth State Bank*, 22 T. C. 539. See also E. P. C. 35, *supra*. We conceded in the cited case that the taxpayer's management was capable and experienced but we denied relief because of the taxpayer's failure to show that its management and officers were in any way superior to that of banks generally.

The same can be said of the instant case. The petitioner has shown that its officers were competent in running the affairs of a magazine-publishing corporation, but no more. It was shown that the officers obtained credit for the petitioner but it was not shown that this is anything more than ordinary in the case of publishing companies in general. In other words, petitioner has not shown that its management has contributed any more to the production of income than ordinary, efficient management is expected to contribute.

In contrast, in *Danco Co.*, *supra*, upon which the petitioner relies, it was shown that the contacts, reputation, and technical attributes of one of the taxpayer's officers were responsible for the immediate flow of business to the taxpayer. We found that "petitioner was not

simply manufacturing and selling an article. In conducting a customs business, it was performing a service in accordance with the specifications outlined by its customers." It is easily understandable, in an organization conducting a customs service such as in *Danco Co., supra,* that the personal and technical reputation of a principal in the organization could be a valuable asset to an organization. See also *Avildsen Tools & Machines, Inc.,* 26 T. C. 1127. The petitioner, in the instant case, was "simply manufacturing and selling an article" and no personal touch of its officers was employed to gain customers or income for the petitioner. We therefore conclude that petitioner has failed to prove that the attributes of its officers were such that they constituted intangible assets within the meaning of section 722 (c) (1).

As we have stated, petitioner next contends that the distribution contracts negotiated between national distribution companies and petitioner constitute intangible assets which make important contributions to income and which are not included in invested capital within the meaning of section 722 (c) (1). The Bulletin on Section 722, as amended by E. P. C. 35, *supra,* lists a group of intangibles to be used as illustrations as follows: "Patents, copyrights, licenses, goodwill, franchises, contracts, secret formulas, secret processes, trademarks, brand names, trade names, subscription lists, * * *." This list is not meant to be all inclusive but is to be used for illustrative purposes.

E. P. C. 36, 1941–1 C. B. 137, cited with apparent approval in *Danco Co., supra,* gives an illustration of how certain intangibles qualify as important income producers under the statute. The taxpayer, a newly organized restaurant business, was permitted by a nationally known restaurant organization to use its name, menus, recipes, and plan of operation. Obviously, this taxpayer's use of these particular features of a nationally known business substantially affected its business-getting capacity, and thereby made important contributions to the income of the taxpayer.

We see in this example, the list of illustrations, and the cases cited, *Danco Co., supra,* and *Avildsen Tools & Machines, Inc., supra,* that the intangible, to qualify under the statute, must be of a nature that places the taxpayer in an advantageous position insofar as income is concerned. Assets such as trademarks, patents, franchises, secret formulas, etc., have an aura of exclusiveness about them. The holders of such assets have valuable income-producing assets because of this exclusiveness and, therefore, have an advantage over the ordinary business without such assets.

There is nothing at all exclusive about a publisher's obtaining a distribution contract with a national distributor. There was testimony to the effect that all publishers of pulp had to acquire national distributor contracts to have a successful magazine and if such a

publisher could convince a distributor that he had a salable publication, he could acquire the distribution contract.

Petitioner is about like any producer who has employed a commission salesman for the article it is about to produce. The distribution company is to perform a sales service for which service it will receive a percentage of the sale price of the article it sells. There may be cases where the employment contract with a sales agency would be an important income-producing factor to the producer, but it is easier to visualize a case where such a contract would often be an important income-producing factor to the sales agency. Certain it is that such a sales and distribution contract would not qualify as an important income-producing factor to the producer without some showing that the contract secured the services of some superior sales and distribution agency. Nothing like that is shown here. There was neither contention nor proof that the companies employed by petitioner were superior to other companies in the business.

The contracts here were shown to be the ordinary distribution contracts of the type that all publishers of pulp magazines enter into with distribution companies. The fact that the distribution contract was entered into, when the article to be produced, the magazine, was in the idea stage, is immaterial. The fact remains that securing the contract by convincing a distribution company of public acceptance of its idea amounts to no more than hiring an ordinary salesman for the product it was about to produce. There was nothing exclusive about the contract. Usually the contracts contained provisions whereby either party could terminate upon 60 days' notice. The record here shows that between 1940 and 1945 petitioner had distribution arrangements with five different companies. At times two or three distributors handled the same magazine at the same time. We hold, under the record presented, the distribution contracts by which the petitioner distributed its magazines do not qualify as intangible assets to petitioner within the meaning of section 722 (c) (1).

Petitioner next contends that it meets the qualifying condition as provided under section 722 (c) (2) in that the business of petitioner is of a class in which capital is not an important income-producing factor. First of all, petitioner failed to introduce any evidence concerning the use or need of capital in its or any class of business, and secondly, it was affirmatively shown that capital was an income-producing factor in petitioner's particular business.

The commissioner's findings of fact demonstrate that petitioner began business with very little capital, operating for the most part on credit obtained. Most of the services and materials employed in publishing petitioner's magazines were obtained on credit. Petitioner seems to think that since credit was obtained capital was not an income-producing factor. Regulations 112, section 35.725–2 (e), ex-

pressly state that where capital is raised indirectly as shown by accounts payable or other forms of credit, and the use of such credit is necessary to the production of income, capital *is* a material income-producing factor. While the cited regulations deal primarily with section 725 (a), the principles outlined therein for determining whether capital is a material income-producing factor should also be applied under section 722 (c) (2). Bulletin on Section 722, as amended by E. P. C. 35, *supra.*

Of course, we realize that even though a corporation employs capital in its operations, capital is not necessarily an important income-producing factor. In the instant case, however, we feel that capital in some form was very necessary. This was not a personal-service type organization as petitioner would have us believe. Petitioner's purpose for existence was to produce an article for sale. Inventories were maintained in each of the years before us. Using the fiscal year ending April 30, 1943, as an example, petitioner had circulation sales income in excess of $200,000. The cost of goods sold, which included the cost of paper, editorial matter, printing, and engraving, was approximately $150,000. Other expenses, such as salaries, rent, and interest, amounted to approximately $40,000. Petitioner had larger, but similar sums representing sales, cost of goods sold, and other expenses in the other years before us. We think that it is obvious from these figures that capital was a very important income-producing factor in petitioner's business.

Petitioner next contends that it meets the qualifying condition set out in section 722 (c) (3) in that its invested capital is abnormally low. The record does not support this contention. In order to establish that a taxpayer's invested capital is abnormally low within the meaning of the statute, the petitioner must show that there is some identifiable abnormality in the taxpayer's invested capital structure. *Springfield Plywood Corporation,* 18 T. C. 17.

Petitioner attempts to establish the abnormality in its invested capital by arguing that it must have been abnormal, as petitioner began business with no paid-in capital. The obvious fallacy in such an argument is that the fact that petitioner began business with no paid-in capital has nothing to do with invested capital of the petitioner in the years before us. The term "invested capital" as used in subsection (c) (3) of section 722 means invested capital as determined under the Code for excess profits purposes. *Springfield Plywood Corporation, supra.* Section 715 defines invested capital and sections 716 through 720 are employed in computing invested capital. Nowhere in the computation is it necessary to know what amount of paid-in capital was needed to begin business.

Petitioner has made no attempt to establish what its statutory "invested capital" was during the years before us. Neither was an attempt

made to establish what the normal invested capital of such a business would be. We are, therefore, asked to compare an unknown to an unknown and find that one is abnormal to the other. This cannot be done. See *Metal Hose & Tubing Co.*, 21 T. C. 365. We therefore find that petitioner has failed to show that it comes within the provisions of section 722 (c) (3).

The conclusion that petitioner has failed to prove that it meets any of the qualifying conditions as set out in section 722 (c) (1), (2), or (3) makes it unnecessary for us to make any determination as to petitioner's attempts to reconstruct a constructive average base period net income. We will state in passing, however, that the evidence presented by petitioner on this issue was generally unsatisfactory.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*