THE TOPEKA STATE JOURNAL, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34492.   Filed May 16, 1960.

◼◼◼◼◼◼◼◼◼◼◼◼

---

*Frank H. Terrell, Esq.*, for the petitioner.
*Edward E. Pigg, Esq.*, for the respondent.

212

OPINION.

HARRON, *Judge:* Since petitioner came into existence after December 31, 1939, it was required under sections 712(a)[1] and 714 to base its computation of excess profits credits on invested capital.

---

[1] All references to sections are to sections of the Internal Revenue Code of 1939.

SEC. 712. EXCESS PROFITS CREDIT—ALLOWANCE.

(a) DOMESTIC CORPORATIONS.—In the case of a domestic corporation which was in existence before January 1, 1940, the excess profits credit for any taxable year shall be an amount computed under section 713 or section 714, whichever amount results in the lesser tax under this subchapter for the taxable year for which the tax under this subchapter is being computed. In the case of all other domestic corporations the excess profits credit for any taxable year shall be an amount computed under section 714. For allowance of excess profits credit in case of certain reorganizations of corporations, see section 741.

It is now seeking a higher excess profits credit based on income, using a constructive average base period net income determined under the provisions of section 722(a), contending that its excess profits taxes for 1944 and 1945 are excessive and discriminatory within the meaning of section 722(a). Petitioner seeks relief under section 722(c), claiming that it qualifies for relief under subsection (1).[2]

In order to qualify for relief under the provisions of section 722(c), a taxpayer must establish the existence of one or more of the qualifying conditions enumerated in that section and, in addition, must show that its excess profits tax is excessive and discriminatory because of the existence of one or more such conditions for the reason that a qualifying condition may not result in the invested capital method's being an inadequate standard for the determination of the excess profits credit. The petitioner must, therefore, demonstrate the inadequacy of its excess profits credit based on invested capital by showing that the inadequacy results from one of the specified factors. *Danco Co.*, 14 T.C. 276, 282.

The taxpayer must also show, within the framework of section 722(a), a fair and just amount representing normal earnings to be used as a constructive average base period net income. This latter requirement, however, has been covered by a stipulation that if it is determined by this Court that petitioner is qualified for relief under section 722(c)(1), then it shall be entitled to a constructive average base period net income of $50,000 to be used in computing its excess profits tax credit for the years 1944 and 1945.

The issue for decision is, therefore, whether the petitioner has shown that it meets the qualifying condition set forth in section 722(c)(1). In short, to qualify for the relief claimed, petitioner must show that its business is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income, and that the existence of that qualifying factor results in an inadequate excess profits credit.

Petitioner contends that the agreement of July 17, 1941, pursuant to which the agency corporation, TNPC, was created, is an intangible asset which comes within the meaning of section 722(c)(1).

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income.

* * * * * * *

In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a). * * *

Petitioner contends that the *agreement* made important contributions to its income and that it is an "asset" not includible in invested capital.

It is the respondent's position that the joint agency operating agreement did not constitute an *asset* of the petitioner. He contends that neither of the principal parties to the agreement believed it was acquiring an asset, but that both expected that *the agency corporation's operations* would serve to reduce certain production costs from which each would benefit in about the same ratio as the value of the assets which each contributed to the new corporation for its use.

Respondent argues, also, that the agreement effected a change in the nature and character of petitioner's operations after July 17, 1941; that the nature and character of petitioner and its business was determined for the purpose of the excess profits tax when it commenced business on February 1, 1940; and that it is the nature and character of a taxpayer's business at the time it commences business after December 31, 1939, that determines its eligibility for relief under section 722(c)(1). In this connection, he cites the Bulletin on Section 722, as amended by E.P.C. 35, 1949-1 C.B. 134, 136, which revised Part VII (E) of the Bulletin as originally issued (G.P.O. printing pp. 136-141), which states in part, with reference to section 722(c), that "[t]he nature of the taxpayer and the character of its business will be determined as of the date on which the taxpayer commenced business. In this situation the term 'commenced business' has the same significance as in section 722(b)(4)."

The respondent recognizes that petitioner's business is of a class which customarily has intangible assets, such as subscription lists and advertising contracts. It is well established that they are an intangible asset of a newspaper. See *Willcuts* v. *Minnesota Tribune Co.*, 103 F. 2d 947, 950; and *Perkins Bros. Co.* v. *Commissioner*, 78 F. 2d 152. However, he points out that those intangible assets were purchased by the petitioner and their value was included in petitioner's invested capital at the time petitioner commenced business, in the amount of $368,776.07.

We will consider first whether the agreement of July 17, 1941, is an intangible *asset* of the petitioner within the meaning of section 722(c)(1) which makes *important contributions to income.*

The Bulletin on Section 722, as amended by E.P.C. 35, *supra*, outlines some of the elements which are to be considered in cases where qualification is claimed under section 722(c)(1), and the following is stated:

The term "intangible assets" is used in section 722 in the sense in which it is ordinarily understood. While generally accepted legal and accounting definitions are valuable guides, they are not considered controlling for this purpose. Patents, copyrights, licenses, goodwill, franchises, contracts, secret

formulas, secret processes, trade-marks, brand names, trade names, subscription lists, and similar assets are illustrative of such intangibles; but the foregoing list is not all-inclusive.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

The taxpayer's rights in the intangible asset, whether legal title, equitable title, license or privilege of use, or any other, must be such that the income contributed by the intangible is properly includible in the taxpayer's income. It is not sufficient if taxpayer is merely the assignee of the income of the intangible. The contribution of the intangible asset to income, while it may be direct or indirect, must be important in the sense that it is significant in relation to the taxpayer's total income.

For the purpose of section 722(c), an asset is includible in invested capital unless it has, in the hands of the taxpayer, (*a*) no unadjusted basis, (*b*) an unadjusted basis of zero, or (*c*) an unadjusted basis which is clearly a nominal amount.

The provision that taxpayer's business must be "of a class" does not imply that there be a division of businesses into trades or industries, or that any other separation into specified groups is required. Here, the word "class" is used in the sense of type, character, or nature, rather than with any requirement that businesses must be segregated into classes. If the nature of the taxpayer's business function, the character of its organization, or the methods it employs in operation are such that intangible assets of the character in question make important contributions to income, it is considered that it falls within the purview of the statute.

Relying upon the cited illustration in the Bulletin, as amended, the petitioner contends that since the agreement of July 17, 1941, is a contract, that agreement is an intangible asset within the meaning of section 722(c)(1) which is not includible in invested capital.

Petitioner's view places chief reliance upon the fact that the creation and operations of the new agency corporation were brought about by the agreement of July 17, 1941, which petitioner observes was a contract. We think such view overlooks the basic fact that it was the joint agency corporation, in which petitioner acquired stock, which was expected to cut costs and thereby increase profits. The substance of the agreement was that it provided for the creation of the agency corporation which took over the operation of certain departments of the two principals (petitioner and Capper Publications) for joint operation. The principal parties did not want to merge their respective corporate entities, or to conduct jointly the entire and complete business of each. They did not want to enter into a complete joint venture. The agreement was a particular and special type of agreement which basically had been devised for the use of a morning and an evening newspaper in the same city, the purpose of which was to cut costs, eliminate some competition, and (it was hoped) thereby increase the profits of the two newspapers. The structure of the arrangement adopted by petitioner and Capper Publications depended upon the creation of a new corporation (whose stock was owned by the principal parties to the arrangement) which

acted as an agent of its stockholders. The agency corporation was a bona fide corporation having directors, officers, working capital, and the use of operating equipment loaned by the stockholder corporations. The agency corporation, TNPC, was in a real sense a subsidiary of petitioner and Capper Publications, being, however, a nonprofit corporation.

The agreement of July 17, 1941, did all of these things: It provided for the creation of a new corporation, TNPC; it specified what the respective stockholdings of petitioner and Capper Publications in the new corporation would be; it made provision for a small amount of working capital for TNPC; it made provision for TNPC's performing, as an agent, certain functions for both petitioner and Capper Publications which each had done previously itself, in independence and also in competition, "for better or worse," and it was hoped that when TNPC carried on such functions it would do so "for better," i.e., for more profit. The arrangement so contrived avoided the impact of certain taxes; it avoided the complications—legal and otherwise—of a merger of petitioner and Capper Publications; but it also had the advantage of being a "silent" arrangement, for the two newspaper-publishing corporations continued as separate corporate entities, ostensibly in full competition with each other, and each was free to continue its own particular editorial policy and style. From a realistic view, the arrangement by the device of using an agency, nonprofit corporation had many of the advantages of the merger of petitioner and Capper Publications but without a de jure merger. The agreement of July 17, 1941, was not a mere contract; it was a great deal more. It was a plan, and a modus operandi, and it also effected a joint agency operating arrangement whereby there was a merger of certain operations of the two newspaper-publishing corporations. The arrangement, the agreement itself, represented a cost-cutting device. To the extent that it reduced costs, it could be expected to accomplish an increase in profits.

In this case, we believe that the critical point is whether the joint agency operating agreement represented an intangible *"asset"* of the petitioner within the meaning of section 722(c)(1). The term "intangible assets" is used in the statute in the sense in which it is ordinarily understood. It is our belief that the ordinary meaning of intangible assets does not include a cost-saving device such as an agency corporation designed to effect a reduction in costs pursuant to a joint agency operating agreement. Such device does not directly make important contributions to income as distinguished from possibly increasing profits by cutting costs. As is noted in E.P.C. 35, *supra*, the statute contemplates an intangible asset which the taxpayer owns exclusively which in itself makes "important contribu-

tions to income." We think that a joint operating agreement which may increase profits by reducing the respective and separate costs of the two competing business entities must be distinguished from an asset which directly produces income, such as an asset owned exclusively by the taxpayer such as a secret process, a brand name or a trademark, a license, copyright, or a patent. Such assets produce income, and are to be distinguished from a joint agency operating agreement whereby two heretofore separately operated businesses resort to the use of a common agent to carry on jointly certain departments and operations.

Certain mechanical operations of a newspaper, printing, and selling subscriptions and advertising, are essentially the same for all newspaper publishers. The hours of the day for the makeup and printing of a morning paper differ from the hours when the same operations are followed in getting out an evening paper. In carrying on the work of the mechanical, sales, distribution, and general management departments, the same types of personnel are employed. Therefore, in these operations one publishing concern incurs expenses for functions which duplicate the same functions of its competitor. The arrangement adopted by petitioner and Capper Publications represented a merger of their respective mechanical operations by the device of using a joint agency corporation to which both transferred their respective departments which carried on those operations. But each newspaper retained and operated separately, as before, its own editorial and newsgathering departments. The arrangement was like a partial merger of the two principals (without tax consequences), except that the Topeka Newspaper Printing Company was an agent of each.

Although petitioner has not introduced into the record complete evidence relating to the basis for the agreement that the net receipts of TNPC would be distributed to Capper Publications and petitioner under a two-thirds and one-third allocation, respectively, it is quite likely that there was a valuation of the respective businesses during the negotiations, and that the principals concluded that the relative value of each business had the agreed proportion. The burden of proof of the petitioner included establishing the underlying facts. Since petitioner has not introduced evidence to the contrary, we assume that the above analysis is a reasonable explanation of the proportion adopted. It follows that if each principal had continued to carry on all of its operations independently, petitioner's volume of business and earnings probably would have been in approximately the same proportion as the joint agency operating agreement adopted, even if the amounts of petitioner's total business and profits might have been less than were eventually realized under the joint operations arrangement.

Both parties suggest that the joint operations agreement served to give petitioner a one-third interest in the sales of Capper Publications, and to allow Capper Publications a two-thirds interest in petitioner's sales. But the suggestion is argumentative and it involves a construction of the arrangement which we think is neither necessary, relevant, nor material. Furthermore, where there is a transaction involving the transfer of interests in a business, there is ordinarily the payment of some consideration for the acquisition of such interest or in earnings. Since neither principal here paid to the other any such consideration, the argument finds no support in the facts before us and we consider it to be theoretical rather than real. From a practical standpoint, our conclusion is that each principal agreed that under the joint agency operation of certain departments, the true share of each, according to the size and extent of its circulation and general business at the time of entering into the agreement, was two-thirds and one-third, respectively. The agreement fixed those proportions for the future; each principal stood to gain or lose something, perhaps, but evidently each was willing to make the bargain because it believed that on the whole the joint operating arrangement would cut costs and in that way would be more profitable than the continuation by each of all operations separately. The general economies which were expected to result from reductions in costs, elimination of duplications of personnel and expenses, and the promotion of the business of each principal concern under joint management were undoubtedly regarded as sound justification for fixing the respective shares of each in future net earnings on the agreed basis of two-thirds and one-third.

The joint agency operating agreement was exactly what it purported to be, namely, a management and operating agreement. Neither principal gave up any of its own property at the time of entering into the agreement in 1941. Each made available to its agent, TNPC, its subscription lists, advertising contracts, and records. Although the printing presses and other printing equipment of The Capital were used for the printing of both The Capital and The Journal, and petitioner moved its editorial, newsgathering offices, and wire services into Capital's building, there was no sale of any property or equipment to petitioner. Petitioner retained its own building but rented it to others. Petitioner acquired one-third of the stock of the new agency corporation which it carried as an asset at a value of $10 per share, or $333.33. TNPC's initial operating funds were advanced by petitioner and Capper Publications apparently as loans. If the joint operating agreement had been terminated under the termination clause after the first 5 years, petitioner and Capper Publications each would have resumed its separate

management, printing, and circulation and distribution of its own newspaper, and the agency corporation would have been dissolved. Furthermore under the joint operating agreement, each principal did not acquire anything other than stock in the agency corporation, but that represented no more than a part of the corporate form adopted for having an agent to carry on certain operations jointly.

In *Danco Co.*, 14 T.C. 276, 285, *Jackson-Raymond Co.*, 23 T.C. 826, and *Avildsen Tools & Machines, Inc.*, 26 T.C. 1127, 1139, this Court recognized that in conducting a customs service business the personal and technical reputations and the skills of the chief officers of a corporation may constitute important factors in the successful operation of the business and the production of income so as to qualify the corporation for relief under section 722(c)(1), because such officers' contacts and reputation may provide the taxpayer with the benefit of goodwill of considerable value even though such goodwill does not constitute an intangible asset includible in equity invested capital. In the cases cited above it was held that such factors constituted intangible assets.

On the other hand, we have held that the mere successful operation of a business through efficient management and competent personnel does not establish the existence of a qualifying factor under subsection (c)(1). *North Fort Worth State Bank*, 22 T.C. 539. Here, the petitioner made an arrangement under which its business could be operated more efficiently and at reduced costs. The arrangement served the same purposes for Capper Publications. The evidence shows that by 1941, such joint management and operating agreements were not uncommon.

To the extent that petitioner's profits increased (after the joint arrangements had become established) from reductions in costs, its increased earnings were due to a tangible factor, savings in costs. To the extent that petitioner's profits increased from enlarged circulation and more advertising contracts, such results were in part produced by more efficient management, but the goodwill which The Journal had already established, before Stauffer took over the newspaper and created the petitioner to continue publishing The Journal, continued to be a factor in producing earnings. There is no evidence that the public knew anything about the joint management and operations agreement which obviously was an internal matter. And since petitioner continued to maintain its own, separate, independent editorial and newsgathering departments, it cannot be said that the increased circulation of The Journal was attributable solely to the joint management and operating arrangement. It must be assumed here that in the operation of a newspaper publication business the editorial policy and style of the newspaper and the extent and

manner of reporting news are among the most important factors in the success of the business. Petitioner's goodwill, subscription lists, and advertising contracts were its own property after as well as before the agreement of July 17, 1941. There is no evidence before us which provides any basis for determining how much of petitioner's income after July 17, 1941, and during the taxable years can be ascribed to its editorial and newsgathering departments, and how much can be ascribed to the circulation and advertising departments. At any rate, petitioner's goodwill, subscription lists, and advertising contracts were intangible assets which were included in its invested capital.

In *Crestwood Publishing Co.*, 29 T.C. 789, 793, 794, a distribution contract of a publisher of magazines was claimed as an intangible asset under 722(c). It was held that a distribution contract which gives efficient distribution did not qualify; that it lacked the requisite characteristic of exclusiveness which is typical of such intangible assets as patents, secret formulas, franchises, trademarks, etc.

In *North Fort Worth State Bank, supra* at 548, we rejected a claim that a lease of property and fixtures at an advantageous rental constituted an intangible asset for the purpose of (c) (1). We regard these cases as authority for concluding here that a joint agency operating agreement, designed to give efficient operation, is not an intangible asset within the meaning of section 722(c). We think it is clear here that the joint agency operating agreement was but an arrangement for achieving more efficient operation at reduced costs of some of petitioner's departments. The arrangement was one in which Capper Publications also achieved reduced costs.

Petitioner relies upon *Journal Tribune Publishing Co.*, 24 T.C. 1048. That case involved a new corporation formed by two competing newspaper corporations which had published the Journal and the Tribune. The new corporation published the Journal-Tribune, one newspaper. The respondent conceded that petitioner qualified for relief under section 722(c) and made partial allowance of petitioner's claims. The only issue before this Court was the amount of the taxpayer's constructive average base period net income. The facts in the *Journal-Tribune* case were different from the facts here. The Journal-Tribune Company was organized with a paid-in capital of only $50,000, which was its working capital. All other assets, tangible and intangible, were leased to the new corporation by the respective corporations which organized the taxpayer. The leased properties included such intangible assets as subscription lists and goodwill. The value of those intangible assets was not carried on the new corporation's books and was not included in its invested capital. No goodwill or going-concern value was included in its invested capital. The *Journal-Tribune* case is not apposite.

It is held, under the record presented, that the joint agency operation agreement under which some of petitioner's operations were carried on by an agency corporation does not qualify as an intangible asset to the petitioner within the meaning of section 722(c)(1), and that the petitioner has failed to establish that it qualifies for excess profits tax relief under section 722(c)(1).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

MURDOCK and RAUM, *JJ.*, dissenting: The only question here is whether the petitioner qualifies for relief under section 722(c)(1). The statute provides that the tax computed without the benefit of section 722 shall be considered to be excessive and discriminatory in the case of a taxpayer like this one if the excess profits credit based on invested capital is an inadequate standard for determining excess profits because the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income. The parties have stipulated that if the petitioner is qualified it shall be entitled to a constructive average base period net income of $50,000.

The only question in view of the stipulation would seem to be whether the contract of August 1, 1941, was an intangible asset which made important contributions to income. No argument is made that it was includible in invested capital under section 718. The Bulletin and other administrative rulings and regulations are only binding to the extent that they are a reasonable and proper interpretation of the law, but even therein it is recognized that a "contract" can be regarded as an intangible asset. The evidence shows that this contract made important contributions to income of the petitioner. Not only did it reduce costs and expenses, thereby contributing substantially to net income, but the evidence indicates that it made some important contributions to gross income through the handling of classified advertisements. We think the petitioner has qualified under section 722(c)(1) and is entitled to the stipulated amount of relief.