GULF DISTILLING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35632. Filed November 30, 1959.

*Aaron L. Danzig, Esq.,* for the petitioner.
*Arnold I. Weber, Esq.,* and *John W. Holt, Esq.,* for the respondent.

TIETJENS, *Judge:* This proceeding involves claims for excess profits tax relief under section 722 (c) (3) of the 1939 Internal Revenue Code for the taxable years ended October 31, 1942, 1943, and 1944. Due to deferments under section 710 (a) (5), deficiencies were determined for the taxable years ended October 31, 1943 and 1944, in the amounts of $176,304.94 and $186,781.23, respectively. Petitioner also claims any carryovers or carrybacks of unused excess profits credits which might result from the granting of the relief requested.

FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

Gulf Distilling Corporation (hereinafter referred to as the petitioner), a Delaware corporation with its principal place of business at Gretna, Louisiana, filed its excess profits tax returns for the taxable years ended October 31, 1942 and 1943, with the collector of internal revenue at New Orleans, Louisiana, and for the taxable year ended October 31, 1944, with the collector of internal revenue for the first district of Pennsylvania.

The petitioner was organized in 1941, and at all times material hereto the majority of its stock was held by Harry A. Robinson. During the years in issue, petitioner engaged in the distillation of commercial alcohol at its plant in Gretna, Louisiana. That plant had been estab-

lished in 1926. For the most part, the equipment originally installed was secondhand, and was capable of producing only denaturing grade alcohol. In 1928, the plant was acquired by the American Commercial Alcohol Corporation, and operated by it through its subsidiary, the American Distilling Company. After September of 1937, no commercial alcohol was produced in the plant, and, as of 1941, it was practically dormant, being used for the storage of liquor and spirits.

In March of 1941, Philip Publicker, a member of American Distilling's board of directors, advised Harry Robinson that the Gretna plant was for sale. Publicker considered the purchase an excellent opportunity to cash in on an upsurge in the commercial alcohol industry. Further, he agreed to resign his post with American Distilling and join with Robinson in the proposed venture.

Though he had lacked technical knowledge pertaining to the operation of an alcohol distilling plant, Harry Robinson was an extremely successful businessman. Throughout his career he had engaged in over 50 business investments, no one of which proved to be a failure from his viewpoint. Among these were purchases of such organizations as the Loft Candy Company, the Champion Container Company, the Boas Box Company, and the drug firm of Hance Bros. & White. He participated in the organization of the R. A. Company, a business which leased between 4,000 and 5,000 automobile vehicles per year to commercial concerns on an annual basis. Prior to 1940, its purchases of automobiles ran some $4 million per year, being made from Chrysler, Chevrolet, and Ford. The R. A. Company also was responsible for handling the gasoline contracts for the Yellow Taxicab Company of Philadelphia, an affiliate, involving the purchase of some 10 million gallons annually. These purchases were made from all the major gasoline companies.

Robinson expressed interest in the Gretna plant purchase, and persuaded others to join with him. Among these were his son, Herman Robinson, as well as Fred Fox and LaVern Herring. The prospective purchasers then undertook a study of the potentials of the Gretna plant. Publicker felt the expenditure of $200,000 would put the plant in good operating condition capable of producing an estimated 25,000 wine gallons of alcohol a day. In addition to studies of operational efficiency, Robinson met with numerous users of industrial alcohol to determine their value as potential customers.

On June 11, 1941, an option to purchase the Gretna plant for $310,000 was acquired in Herman's name for a price of $15,000.

Prior to July 28, 1941, Fox and Herring contacted the Office of Production Management (subsequently to become the War Production Board) to determine if a certificate of necessity could be ob-

tained on the purchase of the plant. They were advised that a certificate could not be granted on a change in ownership absent the addition of new facilities. They further requested assistance from OPM in obtaining a contract from the British Government to convert molasses owned by it in this country into alcohol, but were informed that this was a matter they should discuss directly with the British.

On October 16, 1941, American Commercial Alcohol Corporation sold the Gretna plant to the Gulf Alcohol Products Company, the latter making the purchase through its president, Samuel Coult, Harry Robinson's brother-in-law. The purchase price was $310,000, of which $27,500 was paid in cash, and a mortgage in the amount of $282,500 was executed by Gulf Alcohol Products to American Commercial Alcohol. This sale did not include American Commercial's inventory of whiskey, rum and gin alcohol and related products, and the equipment necessary for its manufacture, nor did it include the equipment used by American Commercial exclusively for the processing of grain into alcohol.

On November 7, 1941, Gulf Alcohol Products Company conveyed the Gretna plant to Samuel Coult and his wife, Leah, in consideration for $27,500 and subject to the existing mortgage of $282,500. The Coult's then leased the plant to the petitioner for a 2-year term, at a monthly rental of 5 cents per wine gallon of alcohol produced during the month, with a stated minimum monthly rental of $2,500.

Meanwhile, on November 1, 1941, petitioner leased from American Commercial the grain-processing equipment which had been excluded from the October sale. This lease provided for a monthly rental of $500, and also provided for an option to purchase the equipment for $35,000, less rentals paid, exercisable within 6 months. When leased, the grain equipment had not been used for the manufacture of alcohol for 3 years. On September 3, 1941, the Acme Coppersmithing & Machine Company, at the request of the Robinson group, prepared a report covering the plant's equipment. On December 15, 1941, Acme prepared a further report, wherein it set forth improvements it felt necessary to increase daily production to 50,000 wine gallons, the amount desired by petitioner's management. One of the suggested improvements was the installation of an 8-foot still. Acme estimated the expense of carrying out its program at $265,400, and noted that work could be concluded 4 months after authorization to proceed. On February 17, 1942, petitioner received a proposal from the E. B. Badger & Sons Co., chemical engineers, covering the installation in the plant of similar equipment.

Faced with the necessity of acquiring new equipment, petitioner sent Fred Fox to Washington to determine whether the Reconstruction Finance Corporation would aid in its purchase. It was suggested by RFC's chairman that an application be filed with the Defense Plant Corporation. Accordingly, on February 2, 1942, petitioner filed an application with the DPC for a proposed expansion of its facilities described as: "Boilers, cookers, piping and other equipment to increase productive capacity for alcohol from grain from 2500 bushels (6200 wine gals.) to 10,000 bus. (25,000 wine gals.)." The estimated cost of the proposed expansion was $317,500. That application was denied, DPC believing ample facilities existed in the United States for the production of alcohol.

Thereupon, Fox again contacted the RFC and this time was advised to file an application for an RFC loan. This was done on March 21, 1942, petitioner requesting a loan of $551,500 for the satisfaction of its mortgage and the acquisition of machinery and equipment deemed necessary to expand production. By an amendment, the amount of the loan was decreased to $549,000.

In the meantime, petitioner had ordered certain equipment from the Acme Coppersmithing & Machine Company, and, on March 24, 1942, delivered to Acme its note in the amount of $20,000, to be applied on the purchase price of an 8-foot copper still which it had ordered.

About April 15, 1942, the RFC granted petitioner a loan in the amount of $550,000, $279,000 of which was advanced immediately to satisfy the existing mortgage on the plant. The balance was to be advanced as the machinery and equipment ordered was installed. Concurrent with the award of the loan, petitioner gave its note to the RFC for $550,000, secured by a mortgage on the plant. The note provided for payment within 5 years, to be made on a monthly basis at the rate of 6 cents per wine gallon of alcohol produced.

This loan was obtained only after petitioner had agreed to certain conditions required by the RFC. One condition was that no salaries were to be paid its principal officers without RFC approval so long as the loan remained unpaid. Another was that the rental payments of 5 cents per wine gallon per month then being paid to the Coults be suspended for the life of the loan. The loan was fully collateralized, and personal guaranties were obtained from both Harry Robinson and Fred Fox.

About April 17, 1942, petitioner purchased from American Commercial the grain-processing equipment it was leasing from that company, for an aggregate purchase price of $25,000 less rentals paid. And, on August 18, 1942, it purchased the Gretna plant from the Coults for $50,000, paid by 450 shares of its stock and an un-

secured promissory note for $5,000. That sale was subject to the RFC mortgage.

When acquired from American Commercial, the Gretna plant was small compared to others in the industry. Its equipment was in bad condition, and its maximum daily capacity providing it was made operative, was some 6,000 to 7,000 wine gallons of alcohol. As purchased, the plant was set up for a pot still operation, being equipped with two beer stills, designated Nos. 1 and 2 respectively, each operated with a redistill kettle and a redistill column. Under this arrangement, it was necessary to distill the alcohol twice in order to manufacture a 190-proof product. To achieve a more economical production, petitioner decided to convert from a pot still to a continuous flow operation. Early in 1942, stills No. 1 and 2 were converted to continuous flow. As of June 1, 1942, petitioner reported to the Alcohol Tax Unit of Internal Revenue that it had a daily calculated rated capacity of about 35,000 wine gallons, but a daily producing capacity of only 18,000 wine gallons. The calculated rated capacity was based upon a formula whose only variant was the diameter of the stills in operation.

As of April 1942, petitioner was sustaining substantial losses of alcohol as a result of many factors. In a submission to the Office of Price Administration, designed to support a readjustment of its maximum price for ethyl alcohol, petitioner stated that it had sustained losses for each of the months of August 1942, through January of 1943, in the following amounts:

| Month | Gallons |
|---|---|
| Aug. 1942 | 16, 668 |
| Sept. 1942 | 28, 703 |
| Oct. 1942 | 30, 393 |
| Nov. 1942 | 44, 978 |
| Dec. 1942 | 47, 943 |
| Jan. 1943 | 63, 981 |

It explained that these losses were due to vapor leaks and to the defective condition of two of its stills. Additionally, it claimed it was losing between 50,000 to 60,000 gallons of beer per month due to its defective fermentation equipment.

The new still ordered from Acme was operating by October of 1942. This was an 8-foot unit equipped with a rectifying column, and was designated by petitioner as still No. 3. In addition, 2 new steam boilers and a new boilerhouse were installed in the plant. As of October 6, 1943, petitioner calculated its rated plant capacity of 115,359 proof gallons per day, some 60,000 wine gallons, as compared with its actual production capacity of 79,800 proof gallons per day,

or 42,000 wine gallons. In arriving at these figures, petitioner took into account the newly acquired boilers and No. 3 still.

In September of 1943, petitioner acquired the services of William I. Steele as plant superintendent. At that time, the No. 3 still was the only one in the plant operating near its efficiency. However, even this still was producing cloudy alcohol due to clogging which prevented proper circulation, and a pinhole in the equipment which allowed leakage into the 190-proof alcohol. The clogging was found to be the result of a failure to clean debris from the equipment. Holes had been drilled in the plants of still No. 1 in an apparent attempt to increase its capacity; and, as a result a dangerously high pressure was required to keep this unit producing. At that time, the unit itself was some 40 years old. Still No. 2 was of good construction and of relatively modern design. However, due to the condition of these 2 units, Steele found the alcohol which they would produce when operated on the continuous vapor phase method to be decidedly inferior. Thus, he placed them on a kettle or pot still method. While this was slower and more costly than the continuous vapor method, and produced a lesser quantity of alcohol, the quality of the product was greatly improved.

On March 25, 1943, the Defense Plant Corporation had entered into an agreement with the petitioner, whereby petitioner had been authorized to purchase in the name of the DPC, and install at its plant, such equipment as might be approved by the DPC pursuant to an acquisition program. The equipment was to be operated by petitioner as a lessee, the DPC to underwrite its purchase price. Rentals were provided as well as an option to purchase the equipment upon the expiration of petitioner's lease. As finally contracted, the DPC was committed to an expenditure of $384,689 under the agreement. As of February 28, 1945, a total of $325,000 had been expended under the contract. Among the facilities acquired as of this date were a deep well, a 55,000-barrel molasses storage tank, 1 wooden fermenter, new yeast room equipment, an additional 8-foot copper still installed in December of 1944, and 10 steel fermenters with a capacity of 200,000 gallons each.

At the time of Steele's arrival, petitioner was operating its plant at about 60 per cent of its rated capacity, producing approximately 30,000 wine gallons of alcohol a day. Its primary emphasis was upon quantity, and not quality, the standards of the product being kept to meet the minimum contractual requirements. Petitioner's monthly production in wine gallons, from December 1941 through February 1945, were as set forth below:

| Month | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|
| Jan | | 197,253 | 1,127,015 | 1,333,181 | 2,239,291 |
| Feb | | 180,405 | 1,162,468 | 1,218,269 | 1,522,961 |
| Mar | | 329,752 | 1,164,220 | 1,374,331 | |
| Apr | | 513,371 | (1) | 1,109,499 | |
| May | | 599,377 | 938,519 | 1,047,257 | |
| June | | 547,129 | 947,983 | 1,282,424 | |
| July | | 528,390 | 872,417 | 1,353,962 | |
| Aug | | 548,621 | 928,321 | 1,385,098 | |
| Sept | | 573,939 | 944,096 | 1,252,298 | |
| Oct | | 1,003,927 | 1,021,699 | 1,296,766 | |
| Nov | | 1,073,365 | 1,095,103 | 1,166,462 | |
| Dec | 252,937 | 736,069 | 1,352,701 | 1,186.379 | |

1 Statistics not available.

From time to time, petitioner borrowed substantial sums of money for operating capital from the Whitney National Bank of New Orleans. On December 19, 1941, March 12, 1942, and April 20, 1942, petitioner executed continuing guarantees in the amounts of $150,000, $300,000, and $850,000 to the bank in consideration for its extension of credit. These guarantees were also signed variously by Henry A. Robinson, S. L. Fisher, Herman E. Robinson, and Fred Fox. The loans received from the bank were fully collateralized by petitioner's inventories and accounts receivable. Subsequently, these guarantees were canceled and were returned to petitioner by the bank in November of 1944.

At all times material hereto, petitioner was a producer of molasses fermentation industrial ethyl alcohol. However, it was not equipped for the manufacture and processing of byproducts and other formulae such as carbon dioxide, vitamins, butyl alcohol, acetone, and acetates, all of which represented a substantial division of manufacturing with other alcohol producers. While it did recover fusel oil, it did not refine it, selling it rather in its washed crude form.

At the outset of its operations, petitioner, not owning any molasses or tankers for its transportation, was forced to acquire this raw material from whatever source was available. Thus in 1941, it purchased Louisiana blackstrap and some Cuban molasses. Subsequently, it contracted for its molasses requirements through the Defense Supplies Corporation.

Initially, petitioner was engaged primarily in the manufacture of antifreeze from molasses alcohol. However, beginning on January 1, 1943, its total production was devoted to the manufacture of 190-proof ethyl alcohol for shipment to the Defense Supplies Corporation. This was occasioned by wartime requirements that all plants capable of producing alcohol produce ethyl alcohol for the Government only.

Petitioner's average equity invested capital, average borrowed capital, average invested capital, invested capital, and excess profits

credit based on invested capital for the years in issue were as set forth below:

| | Year ended Oct. 31— | | |
| --- | --- | --- | --- |
| | 1942 | 1943 | 1944 |
| Money paid in for stock | $58, 863. 01 | $95, 000. 00 | $95, 000. 00 |
| Accumulated earnings | 0 | 35, 252. 31 | 505, 809. 08 |
| 25 per cent of new capital | 14, 715. 75 | 23, 750. 00 | 23, 750. 00 |
| | 73, 578. 76 | 154, 002. 31 | 624, 559. 08 |
| Average reduction in equity invested capital | 0 | 0 | 1, 557. 38 |
| Average equity invested capital | 73, 578. 76 | 154, 002. 31 | 623, 001. 70 |
| Average borrowed invested capital | 388, 209. 10 | 485, 055. 38 | 141, 015. 74 |
| Average invested capital | 461, 787. 86 | 639, 057. 69 | 764, 017. 44 |
| Inadmissible assets | 0 | 0 | 0 |
| Invested capital | 461, 787. 86 | 639, 057. 69 | 764, 017. 44 |
| Excess profits credit at 8 per cent | 36, 943. 03 | 51, 124. 62 | 61, 121. 40 |

For each of the years in issue, petitioner's sales, excess profits net income, and its excess profits net income based on invested capital were as set forth below:

| | Year ended Oct. 31— | | |
| --- | --- | --- | --- |
| | 1942 | 1943 | 1944 |
| Sales | $3, 056, 240. 38 | [1] $7, 310, 672. 52 | [2] $8, 152, 734. 20 |
| Excess profits net income | 75, 909. 73 | 850, 724. 90 | 730, 033. 85 |
| Excess profits net income based on invested capital | 89, 875. 61 | 872, 675. 08 | 738, 162. 80 |

[1] After adjustment for renegotiation of $125,567.
[2] After adjustment for renegotiation of $145,197.

Petitioner filed applications for relief under section 722 for each of the taxable years ended October 31, 1942 through 1944, wherein it claimed it was entitled to an excess profits credit in the amount of at least $740,835.70 based upon a constructive average base period net income of at least $779,826.

Respondent denied these applications, determining that petitioner had not established its right to the relief requested, and further determining it was liable for excess profits taxes for the years in issue in the amounts as set forth below:

| Year ended Oct. 31— | Excess profits tax liabilities |
| --- | --- |
| 1942 | $26, 586. 33 |
| 1943 | 679, 200. 70 |
| 1944 | 607, 788. 93 |

On brief, petitioner now contends that it is entitled to a constructive average base period net income of at least "$380,000 multiplied by the industry wide index of 91.2%."

OPINION.

Petitioner came into existence after December 31, 1939, thus, pursuant to sections 712 and 714 of the Internal Revenue Code of 1939, it was required to compute its excess profits tax credits using the invested capital method. It now maintains that its excess profits credit, based on invested capital, was an inadequate standard for determining excess profits because its invested capital was abnormally low within the meaning of section 722(c)(3).[1] It therefore contends it is entitled to an excess profits tax credit based on income, utilizing a constructive average base period net income determined under section 722(a); more particularly, that it is entitled to reconstruct its average base period net income upon the assumption that it commenced business on December 31, 1939, with the equipment and productive capacity which it possessed at the end of its first excess profits tax taxable year, such reconstruction to be made within the framework of section 722(b)(4).

In order to prevail, petitioner must establish (1) that its invested capital was abnormally low within the meaning of section 722(c)(3); (2) that such abnormality resulted in an inadequate excess profits tax credit; and (3) a fair and just amount representing normal earnings to be used as a constructive average base period net income. *Crestwood Publishing Co.*, 29 T.C. 789 (1958). Therefore, before proceeding to construct an average base period net income, it must affirmatively show that there existed an identifiable abnormality in its invested capital structure. *Springfield Plywood Corporation*, 18 T.C. 17 (1952).

In an effort to sustain its burden, petitioner, for the excess profits tax years in issue, relies upon a comparison of the ratios of its sales to its invested capital, its sales to its net worth, its profits to its net worth, its equity invested capital to its borrowed capital, with similar ratios of 28 industrial chemical corporations and 2,500 leading industrial corporations; contending that such comparisons readily indicate that its invested capital during the period under consideration was abnormally low within the meaning of the statute. As authority for its position, petitioner cites part VII(D) of the Bulletin on Section 722, p. 134, as amended by EPC 35, 1949-1 C.B.

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

\* \* \* \* \* \* \*

(3) the invested capital of the taxpayer is abnormally low.

134, 135,[2] and section 35.722-4(c) of Regulations 112.[3]  It maintains that it was able to operate on such low invested capital due to the relatively small investment required to purchase its plant; the satisfactory financing of the purchase of that plant through the RFC loan; the availability of Harry Robinson's personal credit at local banks; and the fact that no important salaries were withdrawn during the years in issue.

Respondent contends that petitioner has failed to establish a norm within the industrial alcohol industry, with which its own invested capital might be compared, and therefore there is nothing justifying the conclusion that its invested capital was abnormally low.  Moreover, respondent submits that an analysis of petitioner's formation and operation indicates that its invested capital was entirely normal for it, and its type of operation.

After a careful consideration of the lengthy record, voluminous exhibits, arguments on briefs, and cited authorities presented by the parties, we are of the opinion that petitioner has failed to demonstrate that its invested capital was abnormally low within the meaning of section 722(c)(3).  Therefore, we have concluded that petitioner is not entitled to an excess profits tax credit based on income, and, correlatively, not entitled to utilize a constructive average base period net income determined under section 722(a).

As noted above, relief under section 722(c)(3) is predicated upon the existence of an identifiable abnormality in a taxpayer's capital

[2] (D) ABNORMALLY LOW INVESTED CAPITAL.

Section 722(c)(3) deals with corporations having abnormally low invested capital. In such cases there must be present some identifiable abnormality in the taxpayer's business situation which affects the amount of its invested capital.

It is sufficient if the abnormality is established by analysis of the circumstances affecting the taxpayer's own invested capital, although comparisons with other corporations may be used. For example, the fact that invested capital is abnormally low might be established by showing an abnormally high ratio of borrowed capital to total invested capital or by showing that a tangible asset, which makes an important contribution to the taxpayer's income, is not includible, as defined in (B) above, in the taxpayer's invested capital.

[3] SEC. 35.722-4  DETERMINATION OF EXCESSIVE AND DISCRIMINATORY TAX; TAXPAYER NOT ENTITLED TO EXCESS PROFITS CREDIT BASED ON INCOME.——* * * The excess profits tax of such corporations, computed without regard to section 722, shall be considered to be excessive and discriminatory if the excess profits credit based on invested capital is an inadequate standard for determining excess profits because of one or more of the following reasons:

* * * * * * *

(c) The invested capital of the taxpayer is abnormally low. If the type of business done by the taxpayer is not one in which invested capital is small but the invested capital of the taxpayer is unusually low because of peculiar conditions existing in its case, the excess profits credit based on invested capital will be considered an inadequate standard for determining excess profits. Thus, suppose that a corporation commenced business in 1941 with a leased plant valued at $1,000,000, but with equity invested capital and borrowed capital of only $40,000. If the invested capital of such company is unusually low relative to the size of its operations, its excess profits credit based on invested capital might be an inadequate standard for determining excess profits, and the taxpayer would be subject to an unreasonable tax burden if required to compute its excess profits tax under the invested capital method.

structure. The taxpayer here has not persuasively established a comparative norm.

The parties have stipulated that petitioner was a member of the industrial alcohol industry, specifically, a producer of molasses fermentation industrial ethyl alcohol. The record reveals that petitioner was not equipped to manufacture byproducts, and apparently recovered only fusel oil which was sold in its crude state. Accordingly, a proper comparative upon which petitioner could rely to aid in proving its case would be members of the industrial alcohol industry whose methods of operation closely paralleled its own. The record, however, furnishes no basis for making such a comparison. *Metal Hose & Tubing Co.*, 21 T.C. 365 (1953); *Springfield Plywood Corporation, supra.*

Certainly there is nothing before us to relate the 28 industrial chemical corporations, used by petitioner as a comparative, to the petitioner, other than a stipulation as to their identity,[4] and an exhibit setting forth financial data with respect to their operations. Actually, the record reveals that 3 of these 28 concerns were the most diversified producers among the major industrial alcohol companies, producing not only industrial alcohol and related products, but products completely unrelated to the industrial alcohol field. Moreover, there is nothing to indicate which of the remaining 25 corporations were industrial alcohol producers. The same can be said with respect to the 2,500 leading industrial corporations, inasmuch as there has been no identification of the individual companies comprising this group, much less the industries they represent. While we appreciate the many problems inherent in establishing proper comparatives, those difficulties in no way serve as a substitute for the requisite proof.

In light of these facts, we have not made findings with respect to the financial statistics of these two groups, agreeing with the respondent that their materiality and relevance have not been shown.

But petitioner goes further, maintaining that an analysis of its own circumstances justifies a conclusion that its invested capital was abnormally low. It maintains this is an acceptable method of estab-

---

[4] These companies are: Air Reduction Company, Inc., Allied Chemical & Dye Corporation, American Potash & Chemical Corporation, Atlas Powder Company, Catalin Corporation of America, Clorox Chemical Company, Columbian Carbon Company, Commercial Solvents Corporation, Consolidated Chemical Industries, Inc., Continental-Diamond Fibre Company, Darro Corporation, Davison Chemical Corporation, The Dow Chemical Company, E. I. duPont de Nemours & Company, Hercules Powder Company, International Products Corporation, International Salt Company, Liquid Carbonic Corporation, Mathieson Alkali Works, Monroe Chemical Company, Monsanto Chemical Company, National Cylinder Gas Company, Pennsylvania Salt Mfg. Company, Union Carbide & Carbon Corporation, United Carbon Company, United Dyewood Co., Victor Chemical Works, Westvaro Chlorine Products Corporation.

lishing qualification under section 722(c)(3), relying upon that portion of EPC 35, *supra*, which provides:

It is sufficient if the abnormality is established by analysis of circumstances affecting the taxpayer's own invested capital, although comparisons with other corporations may be used. For example, the fact that invested capital is abnormally low might be established by showing an abnormally high ratio of borrowed capital to total invested capital * * *

Petitioner argues that the operation of an industrial alcohol plant necessarily involves a large capital investment, a fact evidenced by the need for a complicated plant, a large inventory of supplies, and the ability to carry customers during credit periods. It submits that the fact that it was able to achieve the operation which it did on a stock investment of $58,863.01 in its first excess profits tax year, and $95,000 in its two succeeding excess profits tax years, while enjoying sales of $3,056,240.38, $7,310,672.52, and $8,152,734.20 in each of those years, respectively, adequately demonstrates that its "situation is by its very nature inherently and highly abnormal."

The immediate fault with this argument is that it assumes the very thing it is designed to prove; i.e., that an industrial alcohol producer similar to the petitioner would normally require a capital stock investment substantially in excess of that maintained by the petitioner. What we said in *Metal Hose & Tubing Co.*, *supra*, seems particularly appropriate here:

Under EPC 35, the problems of the norms of the ratio of borrowed capital to total invested capital, or possibly the norms of the turnover of capital in sales, are merely substituted for the problem of ascertaining when invested capital is abnormally low.

Or, stated differently, the test is an objective one; that is to say, the taxpayer must establish what is normal, before concluding that its own case is abnormal. Proof of the various items which comprise its own invested capital thus is only part of the burden. Moreover, the fact that petitioner was able to operate so successfully on the capital structure which it had tends to prove that its capital was adequate for the type of operation which was conducted. Finally it should be noted that "money paid in for stock" (the $58,000 and $95,000 figures used in petitioner's above argument) is only one of five items which go to make up its statutorily defined invested capital, which during the years in issue, was $461,787.86, $639,057.69, and $764,017.44, respectively.

Since petitioner has failed to show that these latter amounts were abnormally low, due to the lack of proof of an acceptable norm, respondent's disallowance of its claims for excess profits tax relief under section 722(c)(3) must be sustained.

We think it appropriate to note here that the greater portion of the record before us was directed at proof, or disproof, of a proper reconstruction of a fair and just amount representing normal earnings for use as a constructive average base period net income. In light of our holding on the 722(c)(3) issue, we do not reach, and consequently have made no findings relative to, either the reconstruction issue or the issue with respect to carry forwards and carrybacks of unused excess profits tax credits.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*